17-4112 Tony Stahl v. Coshocton County, Ohio, et al. Oral argument not to exceed 15 minutes per side. William Eugene Walker for the appellant. You may proceed. Good morning, Your Honors. May it please the Court, my name is William Walker and I represent the appellant, Tony Stahl, on this matter. I'd like to reserve three minutes at the end. Fine. And I'm going to just ask that you make certain that you keep your voice up for the argument. Okay, thank you. You may proceed, sir. I have a somewhat of a hearing impediment, so these hearing aids sometimes, I think I'm young and I'm not. This case brings a somewhat simplified fact pattern to the Court. It involves what we believe was an illegal seizure, excessive use of force, and deliberate indifference on treating the man after he was shot. So I'd like to start with the wrongful seizure, if I could, and give the background on it. The story shows how the case develops. New Concord is about 20 miles south of Coshocton County. And the decedent, we believe, was driving his truck, but there's nothing in the record that night that showed he was driving this truck. The officer in New Concord has seen a truck run a red light. So he starts following the truck to try to pull him over. The truck won't pull over. He's not speeding. He's not going hundreds of miles an hour. In fact, he opens up a dialogue with the Muskingum County Sheriff's Office, who is his dispatcher, and he reports his time, his speeds, 55, 60, 55, 60. And he drives, the trial court finds about, oh, 20 minutes, and the New Concord officer voluntarily broke off contact and turned around and went back and called his dispatcher. The lights are flashing. Lights are flashing. I believe they might even have the sirens. He's not pulling over. He's not pulling over. He wasn't trying to evade by high speeds. I did go out there, and that road's windy, so it'd be hard to go. Anyways, he called his dispatcher, and he said, I'm breaking off contact. Follow up on it later. And she said, well, we notified Coshocton County. He said, okay. Now, when Muskingum called Coshocton County dispatch, he said, we wanted to give you a heads up. I don't know if you wanted to send somebody down that way or not, but we've got a New Concord following a car. It doesn't want to pull over to him. He's heading towards your district. They didn't really say, we don't know if you want to send somebody, did they? Well, the problem is, later on, the Coshocton officers are sitting up at 36 and 93 at the intersection, and they've never gotten a description of the guy. No one's ever called and said, we want him. They have the tag. Yes, sir. They have the description of the truck. They have the tag, and they have no description of the driver. And the trial court found it was 27 minutes. The driver wouldn't stop. How would you be able to identify him? I agree, Your Honor. I agree. But the fact remains that there was no, you know, those things happen. A police officer can see a hairdo. He could report on the gender of the driver, maybe the race of the driver, maybe the apparent age of the driver. None of that was given. There was no request made that they stop him. I was in there. It was a Muskingum County cop. How did they interact with the Muskingum County cops? City policemen. OK, well, the policemen are in stationary patrol, and they see this car turn. So they come out on him and follow him for about 50 seconds. And they testified they saw no violations. They're going to stop him merely on what was transmitted earlier. And this kid that came out in the fax later, he had a cell phone in his hand, but he couldn't afford a phone. So he could text with it. And so he would hold it up in his hand, and he'd be texting. And when Deputy Schrock from Coshocton County pulled up along, he couldn't get the kid to look at him. And he said he was impervious to the police being there. So Schrock pulls over in front of him to try and slow him down. And he decelerated so fast that the dash cam that we're going to be looking at in this case, following cruising. The officer or the driver? I'm sorry? You said he decelerated so fast. Who's the he, the officer or the- Deputy Schrock moves over in front of the truck and decelerates so fast. The I-COP records the speed drop in like 20 miles an hour in three seconds. And the I-COP picks up conversations inside the cabin of the cruiser, and you hear somebody make an audible grunt. And you see the cars go down, and you see Stahl's brake lights come on. He's trying to avoid Schrock and cut him off. And so he swerves to get around him. And then he pulls up alongside him, and he swerves into Schrock's car. It looks terrible, but I don't know what caused that. And so Schrock spins out, comes in front of the cruiser, I mean in front of Stahl's truck, and he has brake lights come on again. He avoids trying to hit him. And he swerves to the right at about 30 miles an hour. I think the I-COPs are showing a speed of about 39 miles an hour. And at that point, Deputy Snyder pulled his cruiser up to do what they call a pit maneuver, controlled contact maneuver, to spin a car out to get it off the highway. And that was done, and Stahl careens off the embankment on the highway and goes down through a woven wire fence that gets tangled up in his axle. So Stahl, Snyder pulls his cruiser over, and he's got the camera. Snyder, I mean, excuse me, the truck pulled down into the view of where the car's, the cruiser's parking, and can capture what's going on. And you can tell in no time, does anybody go in front of the headlights of that car? Let me ask you, is this comprehensive recitation of the facts geared to showing us the existence of a genuine dispute of facts? Yes. I'm just trying to find out where we're going. I think so. Okay. I think it does. All right. So I guess let's jump to that point. That's the end of the chase and the seizure issue. So the trial court's trying to figure out when did the seizure occur? Did the seizure occur when he was rammed off the roadway with that pit maneuver? Or did the seizure occur when Chirac cut him off, decelerated, and caused a collision? It's our position that that was a seizure. A seizure doesn't have to be continuous. It didn't stop him. It did stop him because he crashed into him, and he had hit his brakes, and they separated someone, and then he went around him. Now, the seizure wasn't- Well, let's accept your version of when the seizure occurred. Why isn't there probable cause at that point to stop the fellow? He's been followed with the lights flashing for all this time. He's apparently not paying attention to any of the efforts of the police to get him to stop. At that point in time, what's your argument as to why there's not probable cause? Well, you can't provoke somebody into stopping. You can't drive down and just turn your lights on, see if people don't stop, and use that as a reason to stop them. We had Chirac's testimony that said he could see in and sees the man looking at his car. You're saying a citizen has a right to just continue down this road if the police have a flashing light behind them, following them, not to stop the car? You're not required by law to pull over when the police officer puts the lights and siren on you. Okay. But the courts have said that's not a seizure. That's a gesture. That's a gesture. But doesn't that create probable cause? Because there's been a violation of law by not pulling over. Well, you can be cited for a failure to yield and failure to obey a police order, but that's not what was in existence here because they didn't see any violations. They didn't know of any violations. So if they just turn their lights on them, that's not a proper stop. And the fact that Mr. Stahl's vehicle hit the police officer's car, isn't that an assault on a police officer, or at least probable cause to believe there was an assault on a police officer? Could be. Could be. Now, that I think would be a question, in fact, for a track finder to fill out, find out. But yes, it would look like it could be an assault on a police officer. And I believe that Deputy Snyder could be justified in thinking he saw an assault. But that, too, now, that's not why he said that later, when Snyder had exercised deadly force, he claimed that's not why he shot Stahl. He wasn't worried about people down the road. Frankly, it would be hard to get that truck up out of that hill. He said when he shot, it was to protect himself, nobody else. And he did that video deposition in the trial transcripts in the record, that hearing transcript. So, I think I'm getting ahead of myself. Did I answer your question? I think so, yeah. Okay. So, now we move to the next stage, which is excessive force. The video captures most of it, from the police car's dash cam. You see the officer get out of his car, come around the front of the car, walk across the road, pulling his handgun out. And he starts to descend on the road. Now, he told the BCI investigator that before he left the road, he could see debris and all kinds of things coming off them tires, like Stahl was trying to get that truck moving down there. But he can't get it moving. It never does it go very fast. Later, we find out there's that woven fence around the axle. Sergeant George testified to that. So, Snyder gets to the bottom of the car, and then he looks at the car, and he wants to run across the car. He claims to check on Stone, who had got out and ran to the driver's side of that car. So, Snyder takes off on his dash in front of the car. He gets off to the 17 degrees off the front seat, front headlight of that car. He said he was 5 feet from the car. And he shot three times through the windshield. The car is still moving. He is still moving. And he gets to the side door and fires two more times, striking Stahl in the throat and through the head. He didn't die right away, but he caused his death. And our argument is that was excessive force. And your argument to get you to two shots through the window is they found another bullet inside the... Yes, they did. Snyder doesn't remember shooting that second bullet. The BCI people traced it to his gun that was found later. But there weren't that many bullet particles that they found. No, no. In fact, you can see in the dashboard, I mean in the front of the car when he shot, the first shot went through the windshield and into the dash area and came out and exited into the steering column, which had been turned 180 degrees. He was actually pulling away from Snyder when he was shot. And then the next round was in the windshield and the third one was up here. And then the two through the side were down low so he could hit him in the throat. The coroner called that a bullet strike. Remind me, did the autopsy show four shots? The autopsy showed... Three would be five shots. No, it didn't show five shots. I know it showed the head wound. How many through the windshield? It's somewhat confusing because he had like entering exit wounds. How many bullet holes in the windshield? Three. And then how many through the side window? I'm having trouble with the math, but that's all right. When do you contend excessive force occurred? Are you contending that the officer should not have shot at all? Or are you contending that the first three shots are okay, but the second two are not? I don't think any of them were justified, and here's why. When you're a police officer and you're going to run in front of a car, it's not like it's a split-second decision you've got to make when you get to the other side of the car. You know when you're going to get in safe. You know when you're getting out of danger. You know when you get to the side of the car, I'm no longer in danger. Stone just stepped aside and let the car go by. He could have, too. He could have, too. Instead, he shot right here. As he went on by, then he shot through here. So you're saying that Detective Snyder didn't have the right to go check on his colleague who was on the side of the car on the other side? That he should have just let the other one, Stone, just fend for himself? No, Judge Butch. I think Snyder's own testimony brings it out. He said he wanted to get on the other side to see if Stone was okay. And when he gets to the other side, he doesn't shoot until he sees Stone standing up with his dog, smashing that side window with a flashlight before he opens fire. Now, he already knows his buddy's okay. There's no need to exercise deadly force to protect him and that car now doesn't pose a danger to anyone. I tried to drill down on him and ask him, what was the imminent danger you faced when you shot twice through that side window? And he danced with me a little bit and I said, can you identify it for me, please? He says, yes, he could have ran right over me. And I said, from the side of the car? He says, he could have backed up and started an assault and hit me. Now, that's not imminent danger, okay? That's what was in his mind for cutting loose deadly force. I'm sorry. Judge Norris has a question for you, even though your red light is on, Judge. At the point the officer, Snyder, gets to the side of the car, as far as we know, Mr. Stahl's still driving. Mr. Stahl is driving the car. So he's a fleeing felon. Don't you have a right to stop a fleeing felon? No. Not if it's deadly force you're using to stop that fleeing felon. And unless you have reason to believe that that felon's going to pose critical damage to somebody else, he's going to threaten someone else. Well, he'd already knocked a police cruiser off the highway into a concrete barrier. And you don't think that's dangerous? It's curious that our guys, the Shaka County deputies, didn't see any violations. There were no calls ever placed in saying, everybody's out here tearing up the place, you've got to stop him. He drove for miles, six, seven miles, without a peep. Counsel. Your red light is on. Thank you for your argument. You'll have your rebuttal time. Thank you, Your Honor. Good morning. Good morning, Your Honors. My name is Andrew Yasowitz. I represent the Coshocton County Appalese in this matter. Judge Bush, I want to start with, follow up on your question as to whether they're really arguing that Deputy Snyder wasn't permitted to fire at all or are they just challenging the last shot that he fired? Because I have the same question. In their briefing, they really don't discuss the first shots that Deputy Snyder fired and for good reason. He fired because a car was coming at him. A truck was coming at him. And this court has stated, and the Supreme Court has stated, that the use of deadly force is constitutional where an officer is probably caused to believe that the suspect poses a threat of serious physical harm either to the officer or to others. And this court just reaffirmed that in a decision that we filed a supplemental authority two weeks ago in Stevens-Ruckert v. City of Columbus. We're supposed to consider the totality of the circumstances from the perspective of a reasonable officer on the scene. That's what Graham v. Connor tells us. So here are the objective facts that Deputy Snyder knew. He knew that Mr. Stahl was driving and evaded law enforcement in the adjoining county. He knew from his own perspective that the truck that Mr. Stahl was driving... By the way, I believe your colleague indicated that Mr. Stahl, was he not speeding when he was being followed initially? What's in the record on that? The speeds during the chase were 55, 60 miles per hour. Was that within the speed limit? I don't know what the speed limit was there. Was there anything else that the initial policeman observed about the car or Mr. Stahl that might give rise to probable cause other than the fact that he wouldn't pull over because of the lights? Well, the initial officer, so he didn't... The initial officer saw a traffic violation. And what did he see? Was it the precipitating red light running the red light? Correct. So you have new Concord officer, Jeremy Downing, sees him go through a red light and then tries to pull him over, lights and sirens, and he doesn't pull over. And he keeps fleeing him for about 20 minutes. At that point, the pursuit comes into Coshocton County from Muskingum County. Downing has testified he wasn't familiar. This is at night. He wasn't familiar with the streets in Coshocton County. He thought it was becoming unsafe for him to continue the pursuit. And so he stopped his pursuit. But he's also testified that he fully expected that Muskingum County... Sorry, Coshocton County officials would assist him. That's why they kept providing updates on the pursuit to Coshocton County. But... And going more towards your point of was there... First of all, you only need reasonable suspicion to stop the car. That's what Delaware v. Prowse House says. There's ample reasonable suspicion in this case. They've got a car that has the same license plate and the same description that was fleeing another officer that was seen 25 minutes ago. Certainly, that alone is reasonable suspicion for an officer to stop the car. And what do you have the ability to do? You need to confirm or dispel your suspicion that this was the same individual that just fled another officer. So when did the seizure occur? Was it when one squad car was pulled in front of the truck or did the seizure occur at some later point? The seizure occurs when Deputy Snyder uses controlled contact to force Stahl's truck off the road. That's when the seizure occurred. The Supreme Court's been very clear on what constitutes a seizure in these circumstances. So you've got the case of Brower v. City of Inyo which says that a suspect is not seized when he's fleeing the police. It's only through means intentionally applied to stop the vehicle that a seizure occurs. And the examples that you have from Supreme Court case law are Scott v. Harris which was a pit maneuver just like Deputy Snyder engaged in in this case. But even if you agreed that the seizure occurs when Deputy Chirac pulls in front of Stahl's truck to try and slow Stahl down at that point you had probable cause not only reasonable suspicion but an opportunity of probable cause to stop the truck for failure to comply which is a violation of Revised Code 2921.331. Misdemeanor? What's that? Misdemeanor? No, that's a felony. Oh, okay. So and the law in Ohio is once an officer signals for you to pull over and you're in a car you have to pull over. If the officer didn't have probable cause or reasonable suspicion to pull you over your recourse is in court. You don't get to just decide I don't have to pull over and keep going. So that's so that's a violation of the law and they certainly had probable cause at that point. I want to go back if I can to the excessive the alleged excessive force I think that's the primary claim in this case. So Snyder knows that this truck has fled other law enforcement he has seen this truck flee him and another deputy so they have two cruisers following this car he won't stop then he sees the truck and ram into Deputy Scharrock's cruiser sending him careening into a concrete barrier and as opposing counsel stated it looks terrible and it certainly would have looked terrible to Deputy Snyder and that's the perspective that we're supposed to judge this case from. In fact he said he's you know Deputy Snyder would be justified in thinking he saw an assault an assault on a police officer which would be at minimum a felony of the second degree in Ohio because it was used with a deadly weapon the car. So he forces the car the truck off the road and Deputy Stone exits with his canine he's trying to get to Deputy Snow he's prevented momentarily from exiting his vehicle as he crosses down to get to Deputy Stone right as he's coming in front of the car then the truck starts to move towards him and here's the testimony in this case from both Deputy Snyder and Deputy Stone. Stahl with both hands on the steering wheel looked right at him and began accelerating towards him at that point Snyder justifiably fears for his life and starts to fire at Mr. Stahl. How many shots? Four shots. There were four shots total and there's no evidence in the record that five bullets were fired. If you look at the post shooting forensic investigation that's in the record entry 91-8 that's the Ohio's Bureau of Criminal Investigation did the investigation the affidavit of Larry Hoopman they found three rounds first of all they found that only four rounds were missing from the gun and he's the only and Snyder's the only one that fired so four rounds missing from the gun they've recovered at least part of all four rounds three rounds impacted the front windshield three rounds impacted the front windshield two of the bullets were recovered from Stahl's body one from his shoulder one from his head another bullet skipped off the roof of the truck and they recovered a fragment of that bullet and the fourth bullet which they didn't find initially was found by the decedent's family later on in the side door of the truck that's every round what about Mr. Walker's point about that is there testimony to that effect just before so Snyder's coming down the embankment he turns to his left to radio the officer that got hit to see if he's okay he doesn't get a response and when he looks back up he can't see Deputy Stone anymore and for Mr. Walker he knows before he starts shooting that Stone didn't get run over just before the shooting he would know that but Stone is still over there in a dangerous position Stone's next to the driver's side window with his flashlight trying to break the window of the truck he can't get behind the truck it's at the moment that he decides I'm going to head to the driver's side the truck's not moving it's when he crosses in front of then it starts to move right at him so it's not moving when he starts moving in front of the truck he thinks the truck may be stationary at that point it was stationary for a brief moment and then just as he crosses in front of the truck's headlights you can see the truck start to move towards him so his testimony starts shooting as a result of the  of the truck so that would also confirm that deputy stone testified that he heard three shots fired within about one second and both said a second yes how close I know you said that officer stone was on the side of the truck banging on the window with the flashlight so when the truck started to move stone was not the one in immediate obvious peril at that time correct correct okay Snyder was coming across the front of the truck you said yes is there anything in the record that shows the distance Snyder was from the truck at the time the truck began to move Snyder testified that he was about five feet from the truck so he was five feet from being run over and one thing that I think you can look at when you look at the video so when you look at the cruiser video in the bottom right hand corner of the video there's the time a day and the date are and you will see the truck when it ends up ends up right where the time and date are in other words the truck ends up right where Snyder would have been if Snyder hadn't moved or if he hadn't been able to get across to the public under our law that an officer is entitled to defend himself if he's in danger of being run over by a truck in addition the district court also found that Snyder was justified in firing because Snyder because Stahl had shown that he wasn't going to stop for anyone that he presented a continuing danger to both officers and to the public and the district court cited Smith vs. Freeland for that and that's a case in which that's a case in which officers had a suspect who engaged in a four minute police chase they had him cornered and he was shot but aside from the obvious failure to comply with the officer's commands failure to acknowledge the blinking lights there's nothing in the record that talks about the truck driving erratically speeding weaving or anything of that nature is that correct? No. Okay. Other than But I'm referring to your statement that it was obvious that he wasn't going to stop for anybody and continue to be a danger to others and so that danger how are you characterizing that danger simply that he just was not going to stop? Well and he rammed into a deputy's cruiser and sent that cruiser into a concrete barrier I mean that's felonious assault certainly even under the Graham vs. Connor factors that is a severe crime that weighs in favor of the use of force what we would ask this court to do in my last remaining seconds is to affirm the decision of the district court granting summary judgment to all Cushockton County defendants. Thank you. Mr. Walker Mr. Walker you have your rebuttal time I'm sorry Your Honor I said you have your rebuttal time Thank you There was a fifth round the BCI found and it is in the record the reports are in the record and we put them in But does it really matter given that the testimony is that all the shots were fired within one second Oh absolutely absolutely because this circuit is still a segmented analysis Isn't this case this recent case that was brought to our attention the Stevens Rucker Rucker case I'm reading that case to say that if you have all these shots we have four shots in that case that are within one second that's considered a single act so isn't don't we just have a single act here whether it's four shots or five shots No I disagree when your position changes in relation to your target and you now have got a position where you're no longer in harm's way and you knew you were going to get there before you started your dash if I get to there I'm safe why can you still shoot but humans have quick enough reaction time to really make that calculus of whether they're in front of the car or the side of the car within a second shooting five shots yes because you had time to pause and ponder I used in a second you know before when you're on your run and you know when I get there I'm home free what how is that something you didn't expect that was something you planned for you got to the side of the car where you knew you would be safe that's not something that jumped up and sprang up and surprised you it's not a split second opportunity you know when I get to the side of the car he can't hurt me and you still shoot so I disagree with that I'm sorry your honor the other case that I had I think it's in the brief I'm sure it is Waterman v. Batten that was a toll gate case I wrote down this guy was in a Maryland Washington airport and he tried to run over some of the sheriff security personnel there and he made his way through a toll booth and they opened up one and shot him and then when he went through the toll booth they kept him and the court said that's not okay that's not okay you knew the danger had occurred that was in his declaration at 91-5 and I believe it's on paragraph 48 in that declaration where he says he saw him before he started shooting that's out of his own words oh you know there's a little discrepancy here too because Stone was the officer trying to break the window the doors ended up being unlocked the other deputies just unlocked him but he said he hit that window multiple times now if the car is coming back past you at a time when it can pose a threat to someone how many times do you think you get to hit that window maybe one then it's moved on so that's all I have unless you have any more questions thank you we appreciate your arguments the matter is now submitted and we'll rule on it in due time thank you